UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
————————————————————————   )
GREAT LAKES REINSURANCE (UK),   )
PLC,                            )
                               )
            Plaintiff,          )
                               )            CIVIL ACTION
        v.                      )            NO. 11-00001-WGY
                               )
JDCA, LLC,                      )
                               )
            Defendant.          )
————————————————————————   )
                               )
JDCA, LLC,                      )
                               )
            Third-Party         )
            Plaintiff,          )
                               )
        v.                      )
                               )
WELLS FARGO BANK, NATIONAL      )
ASSOCIATION, WELLS FARGO BANK,  )
NATIONAL ASSOCATION d/b/a       )
FLATIRON CAPITAL, LLC,          )
FLATIRON CAPITAL, LLC, CPM      )
INSURANCE SERVICES, INC., and   )
CONTINENTAL AGENCY OF           )
CONNECTICUT, INC.,              )
                               )
            Third-Party         )
            Defendants.         )
————————————————————————   )
```

YOUNG, D.J.[1]                                    November 21, 2014

_____

[1] Of the District of Massachusetts, sitting by designation.
See Order Transfer, Jan. 10, 2013, ECF No. 94.

<u>MEMORANDUM AND ORDER</u>

**I.    INTRODUCTION**

This case arises from a dispute over an insurance contract issued by Great Lakes Reinsurance (UK) PLC ("Great Lakes"), an insurer, to JDCA, LLC ("JDCA"), the owner of a Connecticut property that suffered significant fire damage.  Great Lakes brought a declaratory judgment action requesting a determination that it was not liable for any insurance claims because JDCA violated the conditions of the insurance policy or, in the alternative, because the insurance policy had been cancelled before the fire.  JDCA counterclaimed for insurance benefits. Soon thereafter, JDCA added three additional parties: Flatiron Capital ("Flatiron"),[2] which financed JDCA's insurance premiums; CPM Insurance Services, Inc. ("CPM"), which served as JDCA's broker; and Continental Agency of Connecticut, Inc. ("Continental"), which served as Great Lakes' agent.  A series of counterclaims and cross-claims ensued.

Three separate motions for summary judgment are now before this Court.  First, Great Lakes moves for summary judgment on the ground that the insurance contract in question does not require payment because JDCA failed to comply with certain

---

[2] Flatiron Capital is a division of Wells Fargo Bank, N.A. Opp'n Defs. Wells Fargo Bank, N.A., Wells Fargo Bank N.A. d/b/a Flatiron Capital, LLC & Flatiron Capital LLC Pl. Great Lakes Ins. (UK) PLC's Mot. Summ. J., ECF No. 120.

sprinkler system requirements.  Second, Flatiron moves for summary judgment on the breach of contract and negligence claims brought by JDCA, which stem from Flatiron's financing of the insurance premiums.  Finally, JDCA moves for summary judgment on the ground that it promptly paid the relevant insurance premiums.

After careful consideration, this Court GRANTS the Great Lakes and Flatiron motions, and DENIES the JDCA motion.

### A.   Procedural History

This action has a lengthy and complex history.  On January 3, 2011, Great Lakes filed a complaint in federal district court seeking a declaratory judgment that an insurance policy issued to JDCA had been properly rescinded before the insured property was damaged by fire, leaving Great Lakes without any obligation toward JDCA.  Compl. 1, ECF No. 1.  Judge Droney was initially assigned the case.  Elec. Note, ECF No. 3.  JDCA answered on January 19, 2011, denying the substance of Great Lakes' allegations, raising several affirmative defenses, and filing a counterclaim against Great Lakes seeking damages for failure to pay insurance benefits.  Answer Def., JDCA, LLC, ECF No. 9.  On February 11, 2011, Great Lakes answered the counterclaim. Answer & Affirmative Defs. Pl. Def.'s Countercl., ECF No. 10. Discovery proceeded over the course of 2011, <u>see, e.g.</u>, Elec. Note, ECF No. 12, and on December 15, 2011, this case was

3

reassigned to Judge Kravitz after Judge Droney was appointed to the Second Circuit.  Order Transfer, Dec. 15, 2011, ECF No. 18.

The lawsuit then expanded.  On February 9, 2012, JDCA filed a third-party complaint against three third-party defendants: Flatiron, for breach of contract and negligence; CPM, for negligence and breach of fiduciary duty; and Continental, for negligence (collectively with CPM and Flatiron, the "Third-Party Defendants").  Third Party Compl., ECF No. 25.  CPM filed its answer on May 7, 2012, in which it denied the negligence charge, raised a series of special defenses, and brought cross-claims seeking indemnification from Flatiron, Continental, and Great Lakes. Answer & Special Defenses Third-Party Def. CPM Ins. Servs., Inc. Cross-cl. & Jury Claim, ECF No. 48.

Over the next several weeks, the other parties submitted their own responsive filings, denying the substance of JDCA's allegations and bringing similar indemnification counterclaims against many of the other parties in the litigation.[3]  See Great Lakes Reinsurance (UK) PLC's Answer Third Party Compl., Crossclaim, & Affirmative Defenses, ECF No. 51 (answering CPM); Answer, Special Defenses & Cross-cls. Third-Party Defs. Wells

---

[3] On May 22, 2012, Continental filed a motion to dismiss JDCA's breach of fiduciary duty counterclaim.  Third-Party Def. Cont'l Agency Conn., Inc.'s Mot. Dismiss, ECF No. 53.  After not receiving a response from JDCA, consistent with Local Rule 7(a), the Court granted the motion on November 19, 2012.  Elec. Orders, ECF Nos. 65, 91.

Fargo Bank, N.A., Wells Fargo Bank N.A. d/b/a Flatiron Capital, LLC & Flatiron Capital LLC, ECF No. 55 (answering JDCA and bringing counterclaim against CPM, Continental, and Great Lakes); Great Lakes Reinsurance (UK) PLC's Answer & Affirmative Defenses Cross-cl. Filed Def. Wells Fargo Bank d/b/a Flatiron Capital, ECF No. 56 (answering Flatiron); Answer & Special Defenses Third-Party Def. CPM Ins. Servs. Inc. Cross-cl. Third Party Defs. Wells Fargo Bank, Nat'l Assoc. & Wells Fargo Bank Nat'l Assoc. D/B/A Flatiron Capital, LLC, ECF No. 58 (answering Flatiron); Third-Party Def. Cont'l Agency Conn., Inc.'s Answer & Affirmative Defenses Cross-cl. Filed Def. CPM Ins. Serv., Inc. Dated May 7, 2013 & Cross-cl. Against Said Entity, ECF No. 60 (answering and bringing cross-claim against CPM); Third-Party Def. Cont'l Agency Conn., Inc.'s Answer & Affirmative Defenses Cross-cl. Filed Defs. Wells Fargo Bank D/B/A Flatiron Capital Dated May 23, 2013 & Cross-cl. Against Said Entities, ECF No. 61 (answering and bringing cross-claim against Flatiron); Answer & Special Defenses of Third-Party Def. CPM Ins. Servs., Inc. Cross-cls. Third-Party Def. Cont'l Agency of Conn., Inc., ECF No. 63 (answering Continental); Answer & Special Defenses Third-Party Def. Wells Fargo Bank, N.A. d/b/a Flatiron Capital, LLC Cross-cls. Def. CPM Ins. Servs., Inc., ECF No. 64 (answering CPM).

Once all parties and claims were added, discovery continued.[4]  On October 18, 2012, after Judge Kravitz passed away, the case was reassigned to Judge Hall.  Order Transfer, ECF No. 89.  The case was reassigned to this session on January 10, 2013.  Order Transfer, ECF No. 94.

On January 31, 2013, Great Lakes moved for summary judgment on its original complaint for declaratory relief, JDCA's counterclaim for breach of contract, and the cross-claims brought by the Third-Party Defendants.[5]  Pl.'s Mot. Summ. J., ECF No. 98; Mem. Law Supp. Pl.'s Mot. Summ. J. ("Great Lakes Summ. J. Mem."), ECF No. 98-1.  JDCA, CPM, and Flatiron filed motions opposing summary judgment in mid-March 2013.  Objection Mot. Summ. J., ECF. No 105 (JDCA); Mem. Law Def. JDCA, LLC. Opp'n Pl.'s Mot. Summ. J. ("JDCA First Opp'n Mem."), ECF No. 107; Third-Party Def. CPM Ins. Servs., Inc.'s Mem. Law Opp'n Pl.'s Great Lakes Reinsurance (UK) PLC's Mot. Summ. J. ("CPM First Opp'n Mem."), ECF No. 119; Opp'n Def. Wells Fargo Bank, N.A., Wells Fargo Bank N.A. d/b/a Flatiron Capital, LLC & Flatiron

---

[4]  In response to discovery, JDCA filed a revised third-party complaint on February 21, 2013.  Rev. Third-Party Compl., ECF No. 102.  This complaint is very similar to the original third-party complaint.  Compare id., with Third Party Compl.  CPM answered the revised complaint on March 6, 2013.  Answer & Special Defs. Third-Party Def. CPM Ins. Servs., Inc. Revised Third-Party Compl. Cross-cls. & Jury Claim, ECF No. 104.

[5]  For convenience, this motion and the related filings will be identified as the "Great Lakes Summary Judgment."

Capital LLC Pl. Great Lakes Ins. (UK) PLC's Mot. Summ. J.
("Flatiron First Opp'n Mem."), ECF No. 120.   In late June, after
further discovery, these parties filed updated oppositions to
summary judgment.   Supplemental Mem. Law Def. JDCA, LLC Opp'n
Pl.'s Mot. Summ. J. ("JDCA Second Opp'n Mem."), ECF No. 139;
Third-Party Def. CPM Ins. Servs., Inc.'s Supplemental Mem. Law
Opp'n Pl. Great Lakes Reinsurance (UK), PLC's Mot. Summ. J.
("CPM Second Opp'n Mem."), ECF No. 146; Flatiron's Supplemental
Opp'n Pl.'s Mot. Summ. J. ("Flatiron Second Opp'n Mem."), ECF
No. 147.   Great Lakes replied on July 11, 2013. In its reply,
Great Lakes withdrew one ground for its summary judgment motion,
that the insurance policy in question had been cancelled because
of nonpayment, but maintained the second ground, that the plain
wording of the contract precluded payment of insurance benefits.
Mem. Reply Def. JDCA, LLC & Third Party Def. CPM Ins. Servs.'
Mem. Opp'n Mot. Summ. J. ("Great Lakes Reply") 2, ECF No. 148.

  A second motion for summary judgment was soon filed.  On
July 15, 2013, Flatiron moved for summary judgment on the
negligence and breach of contract claim raised in JDCA's third-
party compliant, as well as the derivative cross-claims raised
by CPM and Continental.[6]  Flatiron's Mot. Summ. J. 1, ECF No.
151; Flatiron's Mem. Law. Supp. Mot. Summ. J. ("Flatiron Summ.

---

  [6] For convenience, this motion and the related filings will
be identified as the "Flatiron Summary Judgment."

J. Mem."), ECF No. 151-2.  CPM and JDCA filed motions in partial opposition to the Flatiron motion.  Third-Party Def. CPM Ins. Servs., Inc.'s Mem. Law. Partial Opp'n Third-Party Def. Wells Fargo Bank, Nat'l Assoc., Wells Fargo Bank, Nat'l Assoc., Wells Fargo Bank, Nat'l Assoc. D/B/A Flatiron Capital, LLC & Flatiron Capital, LLC's Mot. Summ J. ("CPM Opp'n Flatiron"), ECF No. 155; Mem. Law. Def. JDCA, LLC Partial Opp'n Third-Party Defs. Wells Fargo Bank, Mot. Summ. J. ("JDCA Opp'n Flatiron"), ECF No. 157. Flatiron replied on August 16, 2013.  Flatiron's Reply Opp'n Mot. Summ. J. ("Flatiron Reply Summ. J."), ECF No. 159.

Finally, on August 7, 2013, JDCA filed a motion for interlocutory summary judgment on the question of whether JDCA timely paid the insurance premiums.[7]  Mot. Interlocutory Summ. J. Pl. Great Lakes Reinsurance (UK) PLC JDCA, LLC ("JDCA Summ. J. Mot."), ECF No. 156.  Great Lakes opposed this motion on September 5, 2013.  Pl. Great Lakes Reinsurance (UK) PLC's Mem. Opp'n Def. JDCA's Mot. Interlocutory Summ. J. ("Great Lakes JDCA Opp'n"), ECF No. 162.

This Court held a motion session on October 4, 2013, at which time it took all three motions under advisement.  Minute Entry, Oct. 4, 2013, ECF No. 169.  There, the Court gave the parties additional time to complete any depositions left

---

[7] For convenience, this motion and the related filings will be identified as the "JDCA Summary Judgment."

outstanding, and after doing so, to report "if any facts have changed." Id.  The parties did so on February 14, 2014. Supplemental Mem. Opp'n Def, JDCA's Mot. Interlocutory Summ. J. ("Great Lakes Supplemental Opp'n"), ECF No. 177; Supplemental Mem. Favor Pl.'s Mot. Summ. J. ("Great Lakes Supplemental Mem."), ECF No. 178; Supplemental Mem. Defs. Wells Fargo Bank, N.A., Wells Fargo Bank N.A. d/b/a/ Flatiron Capital, LLC & Flatiron Capital LLC. (Collectively "Flatiron") Supp. Mot. Summ. J. ("Flatiron Supplemental Mem."), ECF No. 179; Third-Party Def. CPM Ins. Servs., Inc.'s 2d Supplemental Mem. Law Opp'n Pl. Great Lakes Reinsurance (UK), PLC's Mot. Summ. J. & Supp. JDCA's Interlocutory Mot. Summ. J. ("CPM Supplemental Mem."), ECF No. 181; Third-Party Def. CPM Ins. Servs., Inc.'s Supplemental Statement Facts Further Opp'n Mot. Summ. J. Pl. Great Lakes Reinsurance (UK), PLC's Mot. Summ. J. & Supp. JDCA's Interlocutory Mot. Summ. J. ("CPM Supplemental SOF"), ECF No. 181-1.

   **B.  Facts**

   This case began in August 2010, when JDCA contacted CPM, an insurance broker, to help it procure insurance for JDCA's property located at 193 Main Street in Monroe, Connecticut (the "Property").  Local Rule 56(a)1 Statement Undisputed Fact ("Great Lakes R56 Statement") ¶¶ 1-2, ECF No. 98-2; Local Rule 56 (a)(2) Statement Undisputed Facts JDCA, LLC ("JDCA R56

Statement") ¶ C.1, ECF No. 106.  The Property included a skating rink, a gun store, and a small apartment.  JDCA First Opp'n Mem., Ex. 4, Dep. John Scianna 8:17-21, ECF No. 108-3.  CPM helped JDCA prepare an insurance application, which was submitted to Bell & Clements LTD ("Bell & Clements"), a firm contracted by Great Lakes "to assist in the underwriting of certain policies."  Pl.'s Mot. Summ. J., Ex. 3, Aff. ("Ash Aff.") ¶ 2, ECF No. 98-6; JDCA R56 Statement ¶ C.3.  Great Lakes also engaged Continental to serve as its broker.  See JDCA R56 Statement ¶ B.2.

### 1. The Protective Safeguards Agreement

Fire protection was a key issue during the contract negotiations.  The insurance application stated that the Property was "100%" protected by a sprinkler system.  JDCA First Opp'n Mem., Ex. 10, Comm. Ins. Application ("Ins. Applic.") 4-5, ECF Nos. 108-18, 108-19.  During the negotiation process, Continental asked CPM, who was representing JDCA, whether "we are confident that the building is in fact sprinklered[?]"  JDCA First Opp'n Mem., Ex. 6, Kate Gwillim email to Gerald Prast (Aug. 13, 2010), ECF No. 108-18.  CPM replied, "Yes."  Great Lakes Summ. J. Mem., Ex. 5, Email from Kate Gwillim to Gerald Prast (Aug. 13, 2010), ECF No. 98-8; see also JDCA First Opp'n Mem., Ex. 3, Email from Gerald Prast to Tom Lemire (Aug. 12, 2010) forwarding email from Kate Gwillim to Gerald Prast, ECF

No. 108-3 ("According to the tenants of the building there are
sprinklers").  After receiving this coverage information from
Continental, Bell & Clements told Continental that they "[w]ill
need [a] new inspection report and this must show 100%
sprinklered."  JDCA First Opp'n Mem., Ex. 18, Email from Gerald
Prast to Chris Wright (Aug. 13, 2010), ECF No. 109-2.
Continental replied by saying the relevant inspection would be
ordered the week after the insurance contract was agreed upon.
JDCA First Opp'n Mem., Ex. 95, Email From Gerald Prast to Chris
Wright (Aug. 13, 2010), ECF No. 117-1.

The executed contract included a fire protection policy
entitled "Protective Safeguards."  Pl.'s Mot. Summ. J., Ex. 3,
Certificate Ins. ("Ins. Binder") 42, ECF No. 98-6.  As the
specific text and layout of this policy are important to this
litigation, the document will be described in detail.  The
policy is a form document, originally written by Insurance
Services Office, Inc., and numbered IL 04 15 04 98.  Id.  At the
top of the page, the policy is titled "PROTECTIVE SAFEGUARDS"
and, immediately under the title, the document states that
"[t]his endorsement modifies insurance provided under the
following."  Id.  The document first lists "COMMERCIAL PROPERTY
COVERAGE PART," and then after a line break, lists "FARM
COVERAGE PART."  Id.

11

The document then has a "SCHEDULE" section, which includes a listing for premise number, building number, and "[p]rotective [s]afeguards [s]ymbol [a]pplicable." Id. Written under the protective safeguards section is an entry titled "'P – 1' – 100% Sprinklered."[8] Id. Listed below the schedule is an explanations section. First, the header to that section indicates "[t]he following [coverage] is added to the:"

> Commercial     Property     Conditions     General
> Conditions in the Farm Property – Other Farm
> Provisions   Form   –   Additional   Coverages,
> Conditions, Definitions General Conditions in the
> Mobile  Agricultural  Machinery  and  Equipment
> Coverage Form General Conditions in the    Li-
> vestock Coverage Form.[9]

Id. Second, the policy explains that an "Automatic Sprinkler System means: [a]ny automatic fire protective or extinguishing system, including connected: [pumps, tanks, ducts, and other discharge systems.]" Id. The policy further states that:

> We will not pay for loss or damage caused by or
> resulting from fire if, prior to the fire, you: [1.
> k]new of any suspension or impairment in any of the
> protective safeguard listed in the Schedule above and
> failed to notify us of the fact; or 2. [f]ailed to
> maintain any protective safeguard listed in the
> Schedule above, and over which you had control, in
> complete working order.

---

[8] Entries on this line – and this line only – were customized to the individual policyholder.  All other entries are pre-printed form notations.

[9] All dashes and space breaks are duplicated as in the original policy.  Spacing is duplicated as best as possible to show left and right alignment of the original text.

Id. at 43.  With this fire protection in place, Great Lakes
issued an insurance binder to JDCA on August 18, 2010, which was
effective as of August 13, 2010.  See Ins. Binder 4; JDCA First
Opp'n Mem., Ex. 24, Binder, ECF No. 110.

### 2. Knowledge of the Property's Lack of Sprinklers

Despite the pre-contractual representations, the Property
in question lacked sprinkler protection.  A key question in this
litigation is whether the relevant parties knew about the lack
of a sprinkler system and, if so, when they knew.  On January
21, 2010, Continental, which had previously helped broker
insurance for the Property, received an inspection report
stating that an automatic sprinkler system was "N/A."  CPM First
Opp'n Mem., Ex. B, NEIS, Inc. Liability Report, ECF No. 119-2.
Continental canceled its coverage of the Property in March 2010.
See JDCA First Opp'n Mem., Ex. 2, Email from Gerald Prast to
Kate Gwillim (Aug. 11, 2010), ECF No. 108-3.  On August 11,
2010, as the parties were negotiating the insurance contract at
issue in this litigation, Gerald Prast of Continental sent an
email indicating that he knew the property had not been
[sprinklered] under the previous coverage, and stating that "if
not sprinklered [currently] I want more money +15%."  Id.  At
that point, Continental received representations from CPM that
"[a]ccording to the tenants of the building there are
sprinklers," after which Continental appears to have dropped the

inquiry. JDCA First Opp'n Mem., Ex. 3, Email from Gerald Prast to Tom Lemire (Aug. 12, 2010), ECF No. 108-3.

Then, in September 2010, after the policy had been issued, Continental received a new inspection report which stated that the Property in fact had no sprinklers. See JDCA First Opp'n Mem., Ex. 3, Angela Borrelli Dep. 13:14-22, ECF No. 118-1; JDCA First Opp'n Mem., Ex. 28, NEIS Inspection, ECF No. 110-2 ("Risk is not sprinklered at this time, as asked to confirm in the request."). This report -- which contradicted the information provided in the application -- led to a series of email exchanges over the next month as CPM, Continental, and Bell & Clements tried to determine whether the inspection report was accurate and, if the Property was nonsprinklered, what the appropriate next steps would be. See JDCA First Opp'n Mem., Ex. 31, Sept. 23, 2010 Email from Julie Gore to Angela Borrelli, ECF No. 11 (Bell & Clements to Continental: "underwriters have noted the Inspection report however we have this risk listed as . . . 100% sprinklered. Please advise regarding . . . sprinkler system soonest."); JDCA First Opp'n Mem., Ex. 32, Sept. 27, 2010 Email from Angela Borrelli to Stephanie Galonski, ECF No. 111 (Continental to CPM: "a recent inspection noted that the risk is . . . not 100% sprinklered. Please advise that the risk is indeed . . . 100% sprinklered."); JDCA First Opp'n Mem., Ex. 38, Oct. 7, 2010 Email from Lizzie Hutchinson to Gerald Prast, ECF

No. 111 (Bell & Clements to Continental: "Please note that we are awaiting confirmation regarding . . . whether the Building is 100% sprinklered.  Please reply soonest."); JDCA First Opp'n Mem., Ex. 41, Oct. 8, 2010 Email from Angela Borrelli to Stephanie Galonski, ECF No. 112 (Continental to CPM: Following up on an email asking "[p]lease advise that the risk is indeed . . . 100% sprinklered."); JDCA First Opp'n Mem., Ex. 44, Oct 18, 2010 Email from Angela Borrelli to Lizzie Hutchinson, ECF No. 112 (Continental to Bell & Clements: "I still haven't heard anything yet from agent regarding construction and sprinkler system.  I will follow up again and let you know as soon as I hear something."); JDCA First Opp'n Mem., Ex. 46, Oct. 19, 2010 Email from Julie Gore to Angela Borrelli, ECF No. 111 (Bell & Clements to Continental: "If we do not get this information by 26 October 2010, we may have to issue Notice of Cancellation or at least increase the terms as the risk is rated off of being 100% sprinklered.").  Such discussion, however, did not appear to result in any changes to the insurance policy.[10]

---

[10] In his deposition, Gerald Prast of Continental was asked whether "Bell & Clements didn't ask you to do anything on September 15th when they got the [inspection] report[?]" and he responded in the affirmative.  CPM Supplemental Mem., Ex. A, Gerald Prast Dep. 280:1-6, Nov. 18, 2013, ECF No. 181-2.  He was later asked: "[b]ut no action was taken, it was waived, they decided not to do anything[?]", to which he also replied in the affirmative.  Id. at 280:18-22.

### 3. Financing the Policy

During the insurance contract negotiation process, the parties also discussed the financing of the JDCA insurance agreement.  Such discussions involved several subsidiary contracts between the parties to this litigation.  On August 2, 2010, Continental and Flatiron entered into a Premium Finance Origination Agreement (the "PFOA").  Flatiron's Local Rule 56(A)(1) Statement Material Facts Not In Dispute, ("Flatiron R56 Statement"), Ex. 1, Flatiron Capital Premium Finance Origination Agreement ("PFOA") 1, ECF No. 151-1.  The PFOA established a framework by which Continental could log into Flatiron's electronic system and generate quotes for premium financing agreements, which were contractual agreements whereby Flatiron would finance insurance premiums owed by an insured company.  See id.; JDCA First Opp'n Mem., Ex. 114, Dep. Karen Sanchez 23:11-18 ("Sanchez Dep."), ECF No. 142.  Using the authorization provided in the PFOA, Continental generated a Premium Finance Agreement (the "PFA"), which provided that Flatiron would finance the insurance premiums for the Property.  See Flatiron's Local Rule 56(A)(1) Statement Material Facts Not In Dispute, Ex. 4, Premium Finance Agreement ("PFA") 1-2, ECF No. 151-1.

On August 13, 2010, representatives from JDCA and CPM signed the agreement.  Id.  At this time, JDCA paid Continental a $1996.40 down payment on the policy, as required by the PFOA.

16

See Local Rule 56(a)(2) Statement & Disputed Issues Material Fact, Deposited Check 10-12, ECF No. 155-4; PFOA § 3 ("Producer [Continental] shall collect from the Insured [JDCA] the required down payment and insure its delivery to the Insurance Company producing the policies stated under the Contracts.").  The PFA also specified that JDCA was to make nine payments of $673.34, each due on the 13th of the month, starting on September 13, 2010.  PFA § 3.

The PFA, however, did not take effect on August 13. Rather, pursuant to the PFA's terms, the agreement would have "no force until [Flatiron]'s written acceptance is mailed to [JDCA]."  See PFA § 17; Sanchez Dep. 30:18-20.  Moreover, according to Flatiron, because the contracts were generated without Flatiron's involvement (as per the PFOA), the firm did not receive notice that the PFA had been signed until September 29, 2010, when Continental emailed it the executed PFA.[11]  See Sanchez Dep. 24:25-25:3.  At this point, Flatiron began its loan processing activities, but would not accept the agreement because the September 13th payment was past due.  See id. at 30:2-3 ("We will not accept a contract that has past-due payments."); see also id. at 41:9-17.  Flatiron then contacted

---

[11] The extended gap between the contract signing and the delivery by Continental appears to be abnormal; the usual practice, apparently, was to have a much shorter interval.  See Sanchez Dep. 41:9-18.

Continental (but not JDCA or CPM) to inform them that it was missing the September 13 (and later, the October 13) payments. See id. at 30:6-10; 34:12-18.

Then, on November 1, 2010, a JDCA representative, Carmen Rivera, contacted Flatiron.  Rivera told the Flatiron representative that she "wasn't informed until the last couple of days that these payments were due."  Flatiron R56 Statement, Ex. 9, Carmen Rivera Call to Flatiron ("Rivera Call") 1, ECF No. 151-1.  She also stated that she "got a cancellation notice telling me this was [going to] be cancelled."  Id. at 3.  There was also a brief discussion about the due dates; Rivera said that "this I guess is due today," to which Flatiron responded "[y]eah, the first one was due on the, on the 13th."  Id. Rivera and the Flatiron representative went back and forth on various payment procedures; Flatiron recommended a check, because it had a lower service charge than a credit card, and Rivera emphasized that she wanted a monthly bill, rather than a direct payment, so that she could have a physical record.  See id. at 1-3.  The Flatiron representative recommended that Rivera pay the outstanding balance by phone, and said that Flatiron would set up a monthly billing cycle for future payments.  See id. at 4.

In order to settle the bill, Rivera was then transferred to another Flatiron representative who "told [Rivera] that all

[she] had to do was pay the September premium for the 673.34 and everything would be fine."  Flatiron R56 Statement, Ex. 7, Carmen Rivera Dep. ("Rivera Dep.") 34:4-6, ECF No. 151-1. Rivera then told the representative that she wanted to pay the October payment as well, to which the representative replied "no problem."  Id. at 34:9-14.

Later that day, Flatiron received a "phone payment made into [the] web pay system," which transferred the money from JDCA's checking account to Flatiron's account.  Sanchez Dep. 43:2-3; see also id. at 44:12-16.  After receiving the funds, Flatiron accepted the PFA.  See id. at 122:11-20.  It then issued a payment to Continental to cover the JDCA account.  The check was printed at about 2:30 p.m. on November 1, 2010,  id. at 77:15-19, and was sent later that same day by U.S. mail, see id. at 69:2-8.  Flatiron also faxed a funding notification to Continental at 3:39 p.m. on November 1, 2010.  Id. at 107:9-14. Flatiron then sent a Notice of Acceptance to JDCA and CPM and a Notice of Finance Premium to Great Lakes, both of which were mailed out on November 2, 2010.  Id. at 83:17-84:4, 82:14-15, 84:14-16.

### 4. Cancellation, Combustion, and Controversy

On October 26, 2010, Great Lakes issued a notice of cancellation of the insurance policy.  Great Lakes R56 Statement

¶ 8.[12] The reason given was for "non-payment of the premium," and the effective date and time was listed as November 2, 2010 at 12:01 AM. Id. ¶ 8-9. On November 3, 2010, a fire severely damaged the property. Great Lake R56 Statement ¶ 12. JDCA filed a claim for $1,340,000, which Great Lakes denied on December 17, 2010. See JDCA First Opp'n Mem., Ex. 92, Sworn Statement in Proof of Loss, ECF No. 117; JDCA R56 Statement ¶ 7-8, 16. This litigation followed.

**C.  Federal Jurisdiction**

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). The plaintiff, Great Lakes, is a corporation incorporated under the laws of the United Kingdom, and the defendant, JDCA, is a limited liability corporation with a principal place of business in Connecticut. Compl. ¶¶ 1-2. The amount in controversy, $1,340,000, far exceeds the $75,000 statutory threshold.[13]

---

[12]  The Court notes that the document labeled "Notice of Cancellation" bears October 22, 2010 as the date of mailing. Ash Aff., Ex. B at 1. The discrepancy, however, is immaterial for purposes of this Order.

[13] This Court may also properly exercise supplemental jurisdiction over the claims brought against the Third-Party Defendants, even though CPM and Continental are residents of the same state, Connecticut, as JDCA, the third-party plaintiff. See 18 U.S.C. § 1367(b); see also Grimes v. Mazda N. Am. Operations, 355 F.3d 566, 572-73 (6th Cir. 2004) (holding that a district court may properly exercise subject matter jurisdiction over third-party defendant who is nondiverse relative to the

## II.  ANALYSIS

### A.  Summary Judgment Standard

A party may move for summary judgment, and the court must grant the motion, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is a limited tool: "[t]he function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). In considering a summary judgment motion, a court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Thus, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id.  In addition, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (addressing a motion for

---

third-party plaintiff, so long as the third-party plaintiff was the original party defendant).

judgment on the law, but explaining that the standard is the same for summary judgment); see also Seitz v. DeQuarto, 777 F. Supp. 2d 492, 495 (S.D.N.Y. 2011) ("[O]n any issue on which the moving parties bear the burden of proof . . . the Court will disregard evidence in favor of the moving parties – even if uncontradicted – that the jury would be free to disbelieve.").

A moving party is entitled to summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Second Circuit has described this requirement as follows:

> In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by [Federal Rule of Civil Procedure] 56(e), the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried. He cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.

Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

### B.  Great Lakes Summary Judgment Motion

Great Lakes argues that JDCA's failure to provide an automatic sprinkler system amounted to a failure to fulfill a condition precedent under the insurance policy, thereby

relieving Great Lakes of its obligation to pay insurance benefits.  In response, JDCA argues that such a condition never applied to the contract, and even if it did, Great Lakes must still pay the insurance benefits because of waiver, estoppel, or contract reformation.

A condition precedent in an insurance policy must be satisfied before the contract may be enforced.  See, e.g., Kolibczynski v. Aetna Life & Cas. Co., 176 Conn. 676, 679 (1979); Biller Assoc. v. Rte. 156 Realty Co., 52 Conn. App. 18, 23-24 (1999); Restatement (Second) of Contracts § 224 (1981) ("A condition is an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due.").  In this action, Great Lakes argues that JDCA's obligation to provide an automatic sprinkler system was a condition precedent to receiving fire protection, which Great Lakes neither waived nor excused.  To resolve this issue, the Court must decide whether (1) the sprinkler system was, in fact, a condition precedent, and if so, (2) whether Great Lakes is precluded from asserting this argument because of waiver, estoppel, or contract reformation.

### 1.  The Existence of a Condition Precedent

If the insurance contract contained a condition precedent requiring the insured to provide a sprinkler system - a system all parties agree was not present - then Great Lakes is not

obligated to pay any insurance claims, unless certain defenses
apply.  Under Connecticut law, the "[c]onstruction of a contract
of insurance presents a question of law for the court."
Connecticut Med. Ins. Co. v. Kulikowski, 286 Conn. 1, 5 (2008)
(quoting Galgano v. Met. Prop. & Cas. Ins. Co., 267 Conn. 512,
519 (2004)).  Such contracts are "to be interpreted by the same
general rules that govern the construction of any written
contract."  Lexington Ins. Co. v. Lexington Healthcare Grp.,
Inc., 311 Conn. 29, 37 (2014) (quoting Johnson v. Conn. Ins.
Guar. Ass'n., 302 Conn. 639, 643 (2011)).  Interpretation
"involves a determination of the intent of the parties as
expressed by the language of the policy . . . . [giving the]
words . . . [of the policy] their natural and ordinary meaning."
Misiti, LLC v. Travelers Prop. Cas. Co. of Am., 308 Conn. 146,
154-55 (2013)(alteration in original) (quoting QSP, Inc. v.
Aetna Cas. & Sur. Co., 256 Conn. 343, 351-52 (2001)).  As part
of its analysis, a court must "look at the contract as a whole,
consider all relevant portions together and, if possible, give
operative effect to every provision in order to reach a
reasonable overall result."  O'Brien v. U.S. Fid. & Guar. Co.,
235 Conn. 837, 843 (1996).

In many cases, as here, the determinative question facing
the court is whether the insurance contract is clear or
ambiguous.  To answer that question, a court must look to the

four corners of the document, as "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." HLO Land Ownership Assoc. Ltd. P'ship v. City of Hartford, 248 Conn. 350, 357 (1999). A provision is ambiguous when it is "reasonably susceptible to more than one reading," Kulikowski, 286 Conn. at 6, or if the "intent of the parties is not clear and certain from the language of the contract itself," Cantonbury Heights Condo. Ass'n, Inc. v. Local Land Dev., LLC, 273 Conn. 724, 735 (2005). Context informs language, however, and the text of the contract "must be construed 'in the circumstances of a particular case, and cannot be found to be ambiguous or unambiguous in the abstract.'" Lexington, 311 Conn. at 42 (quoting Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 855 P.2d 1263, 1271 (Cal. 1993)) (internal quotation marks, brackets and emphasis omitted).

In determining ambiguity, the court "will not torture words to import ambiguity when the ordinary meaning leaves no room for ambiguity." Kulikowski, 286 Conn. at 6. Similarly, minor inconsistencies within the contract do not necessarily make the policy ambiguous. See id. at 8 (stating that inconsistencies between different declaration title pages do not make a contract ambiguous). The court must, however, look at the language "from the perspective of a reasonable layperson in the position of the

purchaser of the policy." <u>Ceci</u> v. <u>Nat'l Indem. Co.</u>, 225 Conn. 165, 168 (1993).  If the court finds that the contract is, in fact, ambiguous, the terms "must be construed in favor of the insured." <u>Lexington</u>, 311 Conn. at 66; <u>see also</u> <u>Allstate Ins. Co.</u> v. <u>Barron</u>, 269 Conn. 394, 406 (2004) ("when the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted." (alteration in original) (quoting <u>Travelers Ins. Co.</u> v. <u>Namerow</u>, 261 Conn. 784, 796 (2002))).

Applying these principles to the protective safeguards endorsement (e.g., the sprinkler requirement provision in the contract), this Court holds that the existence of a functioning sprinkler system within the Property is unambiguously a condition precedent of the contract.

By its terms, the agreement states explicitly that a functioning sprinkler system is a condition of coverage.  <u>See</u> Ins. Binder 42 ("As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above [referring to "[Automatic Sprinkler System] – 100% Sprinklered]."); <u>id.</u> at 43 ("We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you . . . [f]ailed to maintain any protective safeguard listed in the Schedule above.").

JDCA does not seriously quibble with the conclusion that the sprinkler system is a condition precedent, but rather says that the text of the contract is ambiguous about whether it applies to commercial property or only to farm property.  JDCA argues that because the contractual language states that it is added to the "Commercial Property Conditions General Conditions in Farm Property" of the overall insurance policy, it thus "clearly applies only to" farm property.  JDCA First Opp'n Mem. 7-8 (quoting Ins. Binder 42).  Since the Property is not agricultural, JDCA argues, the sprinkler coverage condition precedent does not apply, and JDCA is entitled to its claim.

This Court respectfully disagrees.  To be sure, this provision is not a model of clarity; the presence of an em-dash between "Commercial Property Conditions" and "General Conditions" would have easily resolved this confusion. Nevertheless, construing "the contract as a whole," O'Brien, 235 Conn. at 843, and interpreting the language in the "circumstances of [the] particular case," Lexington, 311 Conn. at 42, leads the Court to conclude that while the contract could be clearer, it is not, as matter of law, ambiguous.

First, the text of the provision strongly suggests that it is intended to cover commercial property.  The overall header at the top of the endorsement document states that "[t]his endorsement modifies insurance provided under the following,"

and then immediately refers to both "commercial property coverage part," and "farm coverage part."  Ins. Binder 42. These phrases are set out on separate lines of the endorsement, which suggests that they are two distinct parts of the endorsement, one for commercial property, and one for farm property, both of which would be covered under the contract. Given that the Property in question is "commercial property," and that commercial and farm coverage are distinct and independent provisions, the Property would thus fall under the first endorsement provision.

Second, this Court must interpret insurance contract terms so as to give effect to as much of the endorsement document as possible.  See Town of Westbrook v. ITT Hartford Grp., Inc., 60 Conn. App. 767, 774 (2000) ("We construe insurance contracts, like other contracts, so as to give effect to all of their provisions.").  Here, the Property is composed of a firing range, skating rink, and apartment.  Such places could reasonably be termed "commercial property," but could not reasonably be called "farm property."  Under this reading, if the Court construed the endorsement provision to refer only to farm property, the entire endorsement would be rendered useless,

contrary to the contract interpretation principles this Court must apply.[14]

Third, looking beyond the endorsement document to the rest of the insurance binder, this Court must read "each provision . . . in light of the other provisions" in the document.  Electric Cable Compounds, Inc. v. Town of Seymour, 95 Conn. App. 523 (2006) (quoting Cantonbury, 273 Conn. at 735 (2006)).  Nowhere in the insurance binder is agricultural land mentioned.  The binder does, however, include a section entitled "Commercial Property Conditions."  Ins. Binder 40.  Given the presence of that section, it is much more reasonable to read the disputed language "Commercial Property Conditions General Conditions in Farm Property," id. at 42, as referring to that section (and thus read the clause as "Commercial Property Conditions – General Conditions in the Farm Property,") rather than to a Farm Property clause that does not exist in the binder.  Similarly, the endorsement identifies a "Bldg. No. 1" as the property that must be 100% sprinklered.  Id.  Earlier in the binder, the "Commercial Property Coverage Part" defines "Bldg # 1" as "193 Main Street, Monroe," id. at 4, which is the property at

---

[14] Under any reading of the contract, the references to the farm policy will not apply.  Such inapplicability, however, does not render ambiguous the portions of the contract referring to commercial property.  See Binks Mfg. Co. v. Bedwell Co., No. 96-2554, 1997 WL 461908, at *12 (E.D. Pa. July 29, 1997) ("A court should not read inapplicable provisions of a contract in such a way as to create an ambiguity where none otherwise exists.").

question in this litigation.  Additionally, in the Declaration
section of the binder, the parties noted explicitly that
insurance was to cover the Property, that the Property was
"Commercial Property," and that the insurance binder included,
as part of its conditions, the protective safeguard endorsement.
Id. at 4-5.  These internal cross-references strongly indicate
that the covered property (which is subject to the protective
safeguards endorsement) is a commercial property, and thus that
"Commercial Property Conditions" should be read as a separate
provision from "General Conditions in Farm Property."

Finally, there is Connecticut case law suggesting that if,
in light of the entire contract, "the word in question appears
to be an error, the trial court may, by looking at the contract
as a whole, interpret the word so it is more logically suited to
the agreement." Shawmut Bank Conn., N.A. v. Conn. Limousine
Serv., Inc., 40 Conn. App. 268, 274 (1996); see also Allen v.
Allen, 134 Conn. App. 486, 493-94 (2012) (concluding, in light
of the "terms and intent of the present agreement as a whole,"
that a term was used in error, and thus substituting the correct
word).  Here, as discussed above, looking at the entire
agreement supports the conclusion that the protective services
endorsement is intended to cover commercial property, and thus
this Court concludes that the lack of an em-dash between
"Commercial Property Conditions" and "General Conditions in Farm

Property" is an error, albeit an error which does not create
ambiguity.

Thus, while the protective safeguards endorsement is far
from a model of clarity, in light of the principles used to
interpret insurance contracts, this Court cannot hold that these
inconsistencies create ambiguity, and thus concludes that the
insurance contract has a valid condition precedent requiring the
presence of an automatic sprinkler system.  See Kulikowski, 286
Conn. at 334; cf., e.g., Chickasaw Nation v. United States, 534
U.S. 84, 88-89 (2001) (declining to find ambiguity even in the
face of poor drafting).

### 2.   Waiver, Estoppel, and Reformation of the Condition Precedent

Even if an insurance contract is subject to a condition
precedent, an insurer may, under certain circumstances, be found
to have waived the condition, or alternatively, to be estopped
from raising the existence of the condition as a defense.  Under
those circumstances – which JDCA and the Third-Party Defendants
argue applies in this case – the insurer would remain liable for
the claim.[15]

---

[15] Such a claim could lie only if Continental or Bell &
Clements, who were the only parties to interact with JDCA or its
agent, CPM, were acting as Great Lakes' agent, such that they
had the authority to bind the principal.  Restatement (Third) of
Agency §§ 2.01, 2.03 (2006).  Ordinarily, "[w]hen procuring
insurance for a person . . . a broker becomes the agent of that
person for that purpose.  Once that purpose is accomplished,

### a.  Waiver

JDCA argues that even if the protective services endorsement in the insurance binder covered the Property, Great Lakes waived it.  Great Lakes, unsurprisingly, disagrees. Answering this question requires this Court to parse a muddled set of Connecticut state cases.

Under Connecticut law, "[w]aiver is the voluntary relinquishment of a known right."  MacKay v. Aetna Life Ins. Co., 173 A. 783, 787 (Conn. 1934).  For a waiver to be successful, there must be "both knowledge of the existence of the right and intent to relinquish it."  Heyman Assocs. No. 1 v. Ins. Co. of the State of Pa., 231 Conn. 756, 777 (1995).  A

---

however, and the insurance is procured, the agency relationship between the insured and the broker terminates, and the broker is without any authority to do anything which further affects the insured unless expressly or impliedly authorized by the insured to do so."  Lewis v. Mich. Millers Mut. Ins. Co., 154 Conn. 660, 664 (1967) (internal citations omitted).  Given that the conduct in question occurred after the insurance was purchased, this rule would suggest that no agency relationship existed when the relevant waiver activities allegedly took place.

Under certain circumstances, however, an agency relationship may continue even after the insurance contract is signed.  See ITC Invs., Inc. v. Emp'rs Reinsurance Corp., No. CV98115128, 2000 WL 1996233, at *18 (Conn. Super. Ct. Dec. 11, 2000).  Because, however, "[t]he existence of an agency is a question of fact," Fussenich v. DiNardo, 195 Conn. 144, 159 (1985), and because there is some evidence that Continental and Bell & Clements had the power to modify or cancel insurance on their own authority, see, e.g., CPM Supplemental SOF ¶¶ 2-3, a reasonable jury could conclude that there was an agency relationship.  Thus, for the purposes of this summary judgment motion, this Court assumes that there was an agency relationship between Great Lakes and Continental and/or Bell & Clements.

party may show waiver either expressly or through "acts and conduct inconsistent" with an intent to assert its rights. Dichello v. Holgrath Corp., 49 Conn. App. 339, 350 (1998) (quoting Hendsey v. S. New England Tel. Co., 128 Conn. 132, 135 (1941)). The question of whether a party has effectuated a waiver is ordinarily a question of fact. C.R. Klewin Ne., LLC v. City of Bridgeport, 282 Conn. 54, 86 (2007). Under some circumstances, however, such as where there is insufficient evidence to support a claim, waiver is a question of law. See Pero Bldg. Co., Inc. v. Smith, 6 Conn. App. 180, 184 (1986) (evaluating a waiver as matter of law because of clear contract terms); Binder v. Windmill Mgm't, LLC, No. FSTX08CV106004435S, 2013 WL 593936, at *18 (Conn. Super. Ct. Jan. 17, 2013) (finding no waiver at the summary judgment stage because the defendant presented no evidence of a knowing and voluntary relinquishment of a right). Importantly, for these purposes, the "party claiming waiver has the burden of proving the claim." L & R Realty v. Conn. Nat. Bank, 46 Conn. App. 432, 438 (1997).

"Mere knowledge" of a party's noncompliance with a condition precedent "is insufficient to show that the [party] intentionally relinquished or abandoned this exclusion." Afifi v. Standard Fire Ins. Co., No. NNHCV116017083S, 2013 WL 541383, at *3 (Conn. Super Ct. Jan. 15, 2013). In the general field of contract law, intent to relinquish can be found if an insurer

had (1) full knowledge of the relevant damage that would ordinarily be excluded, and (2) either made an explicit statement that the insured would be covered, or made an implicit affirmative statement to that effect, such as telling the insured that "everything would be taken care of."  Hendsey, 128 Conn. at 136; see also Town of Andover v. Hartford Accident & Indem. Co., 153 Conn. 439, 445 (1966) (finding implicit waiver when insurer affirmatively defended a policyholder in court even though insurance policy had a condition that did not require a defense); Banks Bldg. Co., LLC v. Malanga Family Real Estate Holding, LLC, 102 Conn. App. 231, 240-41 (2007) (finding implied waiver when parties agreed to continue contract, even after express terms stated that the relationship should terminate).

The law is more complicated, however, for insurance contracts, and there are two cases from the Connecticut Supreme Court suggesting that different rules than those stated above may apply.  One case, Heyman, 231 Conn. 756 (1995), subjects insurance contracts to a much more stringent standard than the waiver rules discussed above.  There, the court essentially stated that a party cannot waive an explicit contractual provision, holding:

> In the insurance context, moreover, it has been
> recognized that 'a contract, under the guise of
> waiver, [may not] be reformed to create a liability
> for a condition specifically excluded by the specific
> terms of the policy.'  This limitation on the

applicability of waiver to an insurance contract
recognizes that because waiver requires the
relinquishment of a known, and therefore existing,
right within the insurance contract, a party cannot
create through waiver coverage for a claim that the
parties expressly had excluded from that contract.

Id. at 777 (quoting J. & J. Appelman, Insurance Law and Practice

(1981) § 9090, pp. 584-85) (alteration in the original).

Connecticut state courts have interpreted this statement as

severely limiting waiver claims that contradict the plain text

of the policy.  See Afifi, 2013 541383, at *3 ("Here, the

insurance policy clearly excludes nonresidence premises.  Thus,

the defendant did not waive its right and reform the policy to

create a liability that is specifically excluded by the terms of

the policy."); Masonicare Corp. v. Marsh USA, Inc., No.

CV030821900S, 2005 WL 941412, at *2 (Conn. Super. Ct. Mar. 16,

2005) ("[U]nder no conditions can the coverage or restrictions

on coverage be extended by waiver . . . .") (quoting Linemaster

Switch Corp. v. Aetna Life & Cas. Co., No. CV-91-0396432S, 1995

WL 462270, at *38 (Conn. Super. Ct. July 25, 1995)); Sentry

Claims Serv. v. Botwick, No. CV030477960S, 2004 WL 1463004, at

*4 (Conn. Super. Ct. June 8, 2004) (same).[16]

---

[16] This rule is not absolute, however, and state courts have
held that, notwithstanding Heyman's principle, "an insurer may
still waive the assertion that it owes no duty to defend its
insured by engaging in conduct inconsistent with a valid
reservation of rights."  Cambridge Mut. Fire Ins. Co. v. Sakon,
132 Conn. App. 370, 384 (2011) (citing West Haven v. Hartford
Ins. Co., 221 Conn. 149, 165 (1992)).  This principle has

Heyman, however, is in some tension with the Connecticut Supreme Court's 1934 decision in MacKay, 173 A. 783.  There, the court held that "[w]hen the insurer, at the time of the issuance of the policy, has knowledge of existing facts which, if insisted on, would invalidate the contract from the time of its inception, it may be held by delivering the policy and accepting the premium, to waive the cause of avoidance." 173 A. at 787. Such a rule suggests that a waiver argument can succeed, at least in certain circumstances, even in the face of explicit contractual language.  This language has rarely been used in recent times, although the Second Circuit quoted it favorably in 2009.  See JEM, Inc. v. Seneca Ins. Co., 309 F. App'x 491, 493 (2d Cir. 2009).

Despite the inconsistencies between the cases, MacKay has not been formally overruled, and this Court must therefore reconcile the two decisions to the extent possible.  The best way to do so is to consider the timing of the purported waiver: MacKay, by its terms, focuses on knowledge at the inception of the contract.  Heyman, by contrast, contains no such temporal language, and thus can be read to refer only to purported waivers occurring after the policy was created.  This Court thus

generally been limited to situations where an insurer's duty to defend in court has been implicated, and the insurer has filed suit on the insured's behalf.  See, e.g., id.; Amica Mut. Ins. Co. v. Paradis, No. HHDCV136041224S, 2013 WL 7088322, at *3 (Conn. Super. Ct. Dec. 27, 2013).

holds that if a party has knowledge of the existence of a condition that would defeat coverage before the contract is signed, MacKay applies, if not, Heyman controls.

Further adding to this somewhat convoluted body of case law, there is some authority within the Circuit suggesting that, despite MacKay and Heyman, the more general waiver rule discussed above applies in insurance waiver cases.  See JEM, 309 F. App'x at 492-93 (applying Town of Andover's implicit and explicit waiver factors).  For the sake of completeness, therefore, this Court will analyze this case under both standards.  In so doing, it first looks at pre-contract formation knowledge, to determine whether MacKay applies, and it then looks at post-formation knowledge, to see if either the general waiver cases or Heyman would justify waiver.

### i.   Pre-Contract Knowledge

This Court first turns to the question of whether Great Lakes had knowledge of JDCA's lack of fire protection at the time the contract was executed.  If it did, MacKay would apply, and there could be a colorable argument that Great Lakes had waived the protective services endorsement.  JDCA alleges that Continental (and thus Great Lakes) was aware that the Property lacked sprinklers before the insurance contract was issued.  See JDCA Second Opp'n Mem. 14.  Considering the available evidence and drawing "all reasonable inferences in favor of the nonmoving

party," Reeves, 530 U.S. at 150, this Court holds that a reasonable jury could not reach such a conclusion.

Continental, which was Great Lakes' agent, knew, based on the January 2010 inspection report, that the Property was not sprinklered as of the beginning of 2010.  Thus, in August 2010, the relevant timeline for when the contract negotiations began, it would be reasonable to infer that Continental's baseline understanding was that the building lacked appropriate fire protection.  Continental, however, received assurances before the policy was approved – both in the insurance application itself and then later in email communication with CPM – that the building was properly sprinklered.  See Section I.B.2, supra. Given both that the Connecticut Supreme Court has applied an "implied covenant of good faith and fair dealing" to insurance contracts, Buchman v. People Exp., Inc., 205 Conn. 166, 170 (1987), and that Connecticut courts have held that "an insurer is entitled to rely on the representations of the insured and (with qualifications) that the company is under no duty to investigate the truthfulness of the representations," Assurance Co. of Am. v. Aruri, No. CV 960559919, 1998 WL 313537, at *3 (Conn. Super. Ct. May 28, 1998) (quoting Variety Homes, Inc. v. Postal Life Ins. Co., 287 F.2d 320, 323 (2d Cir. 1961)), reliance on such representations by Great Lakes was reasonable. Under such conditions, it would therefore not be reasonable for

a jury to infer that Continental knew that the building was nonsprinklered before the contract was signed.[17]  Thus, MacKay's more permissive waiver standard does not apply, since the insurer believed at the time of issuance that the property was protected.

### ii. Post-Contract Knowledge Under General Waiver Standards

The Court then turns to post-contract knowledge, and first applies the general waiver standards identified above.  After the September 2010 independent inspection report that found that the building was nonsprinklered and the subsequent email traffic discussing the report's findings, it would be reasonable for a jury to infer that Continental knew that the Building was nonsprinklered after the contract took effect.  Knowledge alone, however, is not enough to find waiver, and the party with the burden of proof, in this case JDCA, must demonstrate that Great Lakes intended to waive the protective services endorsement.

Waiver may be either express or implied.  See Banks Bldg. Co., 102 Conn. App. at 239.  With respect to express waiver, JDCA cannot point to any explicit, affirmative statements made to it by Great Lakes or its agents indicating any intent to

---

[17] Before the contract was signed, Bell & Clements requested an inspection of the Property.  This might support an inference that, at the time, they suspected that the Property might not be sprinklered, or at least that they were unsure whether it was sprinklered.  It does not follow from such inferences, however, that they knew the Property was unprotected.

waive. Indeed, the evidence in the record indicates that neither Bell & Clements nor Continental took any action after receiving the inspection report, which is, of course, inconsistent with an explicit waiver. See CPM Supplemental Mem., Ex. A., Gerald Prast Dep. 280:1-6, 18-22, Nov. 18, 2013, ECF No. 181-2.

Nor is there evidence of implied waiver. As discussed supra, implied waiver requires the insurer to take actions inconsistent with the existence of the provision in question. See Town of Andover, 153 Conn. at 445; Banks Bldg. Co., 102 Conn. App. at 240. CPM argues that the fact that Great Lakes did not cancel the insurance binder after receiving the September inspection report, as they were permitted to do under the contract, demonstrates implied waiver – or, said differently, that the company's willingness to cover a building, knowing full well that it was not protected, meant that it had consented to a waiver of the endorsement. See CPM First Opp'n Mem. 18-22; CPM Second Opp'n Mem. 13-14; see also Ins. Binder 59 ("The cover provided hereon is subject to underwriter's receipt and approval of an up to date inspection report no later than 60 days from inception, which report shows no material change in the risk . . . . [s]hould the inspection reflect any material change in the risk . . . underwriters may cancel the risk or request remedial work to subject premises be completed within 30

days."). After due consideration, this Court rejects that argument.

First, case law on implied waiver makes clear that the court is to look at the "acts and conduct of the defendant," a command which implies that the implied action in question must be affirmative – e.g., a statement or representation made to the insured that would be consistent with a view that the policy in question had been waived. Banks Bldg. Co., 102 Conn. App. at 239; see also C.R. Klewin Ne., 282 Conn. at 87-88 (finding that a party had "waived its right . . . because of its affirmative conduct"); Town of Andover, 153 Conn. at 445 (holding that the insurer's "actions [defending the insured in court] constituted a waiver of its right to avoid its obligations under the policy"); Worth Constr. Co. v. Dep't of Pub. Works, 139 Conn. App. 65, 71 (2012) (waiver requires "evidence of intelligent and intentional action by the petitioner of the right claimed to be waived") (quoting Krevis v. Bridgeport, 262 Conn. 813, 823 (2003)). This Court is not aware of any binding case law suggesting that implied waiver can exist in the absence of any such affirmative acts, and the parties point to none. Given that framework, then, the mere maintenance of a policy after receiving information of noncompliance does not seem to reach the level of active representations required by governing law. Such a conclusion would also be in tension with the rule that

mere knowledge of noncompliance is insufficient for a finding of waiver, <u>Afifi</u>, 2013 WL 54138 at *2, as the line between knowledge and passive waiver is extremely thin.

Second, even if passive implicit waiver is permissible as a general matter, it cannot be found here.  Bell & Clements, by all indications in the record, did not accept JDCA's noncompliance with the protective services endorsement, but rather wanted to cancel the policy if it turned out that the building was unprotected.  <u>See</u> Mem. Law Def. JDCA, LLC. Opp'n Pl.'s Mot. Summ. J., Ex. 46, Oct. 19, 2010 Email from Julie Gore to Angela Borrelli, ECF No. 112 (Bell & Clements to Continental: "If we do not get this information by 26 October 2010, we may have to issue Notice of Cancellation or at least increase the terms as the risk is rated off of being 100% sprinklered.").  While the record could support an inference that the parties were unsure as to the status of the fire protection, there is insufficient evidence to support an inference that the parties had accepted noncompliance, and thus an implied passive waiver argument fails.

Thus, under the general waiver provisions embodied in Connecticut law, Great Lakes has not waived the protective endorsements provision.[18]

---

[18] JDCA and CPM make two additional arguments.  Neither succeeds.

### iii.  Post-Contract Knowledge Under **Heyman**

In any event, as discussed above, Heyman provides the rule
of decision for waiver determinations in insurance contract
cases.  Heyman holds that an insurance contract, once entered
into, cannot then be "reformed [through waiver] to create a
liability for a condition specifically excluded by the specific
terms of the policy."  231 Conn. at 777.  While there is an
exception for situations where the insurer has filed suit on the
insured's behalf without a reservation of rights, that exception
does not apply in this case.  See Cambridge Mut. Fire Ins. Co.,
132 Conn. App. at 384.

---

First, they rely extensively on evidence suggesting that
Continental would have been willing, at the contract negotiation
phase, to accept a higher premium if the Property did not have a
sprinkler system.  See, e.g., CPM Second Opp'n Mem. 9, 13.  Such
a statement, however, would not support an inference that the
company would have been willing to waive the protective
safeguards provision (without compensation for the increased
risk) after entering into the contract.  Moreover, email traffic
from Bell & Clements does indicate that they would be open to
waiving the endorsement, but only if they received a higher
premium rate.  See Mem. Law Def. JDCA, LLC Opp'n Pl.'s Mot.
Summ. J., Ex. 46, Oct. 19, 2010 Email from Julie Gore to Angela
Borrelli, ECF No. 112.  Such a statement implies that they had
not yet waived the endorsement, and would not without additional
compensation.  There is no evidence in the record which would
support a conclusion that they would waive the condition without
receiving something in return.

Second, CPM argues that Great Lakes' commissioning of the
September 2010 inspection "suggests a waiver," CPM Second Opp'n
Mem. 13.  This fact, however, is used to support a knowledge
claim, See id. at 14.  As discussed above, even assuming that
Great Lakes knew there was no sprinkler system, knowledge alone
is not enough to find waiver.

Thus, because this Court construes the protective services endorsement unambiguously to require an automatic sprinkler system as an explicit predicate to protection, which, by necessary implication, excludes an unprotected building from coverage, this Court cannot, under Heyman, hold that the endorsement has been waived.[19]

### b. Estoppel

A close cousin to waiver is the concept of equitable estoppel.  A party asserting estoppel must prove three elements.  First, "the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act upon that belief; and [second,] the other party must change its position in reliance on those facts, thereby incurring some injury."  Boyce v. Allstate Ins. Co., 236 Conn. 375, 385 (1996).  Third, the party alleging estoppel must also show that "[they] exercised due diligence to ascertain the truth and that [they] not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge."  Voris v.

---

[19] CPM relies on the First Circuit's decision in General Star Indem. Co. v. Duffy, 191 F.3d 55 (1st Cir. 1999), for the proposition that "an insurer may lose its right to rescind the coverage of an insurance contract if it knows of the facts that may warrant recession and fails to disclaim within a reasonable time, or if it acts in any way inconsistent with an intent to disclaim."  Id. at 59; CPM Supplemental Mem. 7.  This is a statement of Massachusetts law, not Connecticut, and thus does not govern here.

Middlesex Mut. Assur. Co., 297 Conn. 589, 604 n.10 (2010)
(alteration in original) (quoting Boyce, 236 Conn. at 385-86).

Considering the available facts, and drawing all inferences
in its favor, JDCA cannot establish these elements.  Critically,
even assuming all facts in JDCA's favor, as this Court must,
there is no evidence that Great Lakes or its agents took actions
which were intended to induce reliance.  JDCA's manager stated
in an affidavit that "[n]o one from Continental Agency of
Connecticut, Inc., CPM Insurance Services, Bell and Clements or
Great Lakes Reinsurance (UK) ever spoke to me about sprinklers
for the subject property and I never told anyone, at anytime,
that the building was sprinklered."  Mem. Law Def. JDCA, LLC
Opp'n Pl.'s Mot. Summ. J., Ex. 111, Scianna Affidavit ¶ 5, ECF
No. 118-17.  This statement -- that there was no discussion
about the sprinklers -- is not consistent with the assertion
that JDCA acted in reliance on Great Lakes' representation.  It
also stands in sharp contrast to other instances where
Connecticut courts have found estoppel in the insurance context.
See, e.g., Mascola v. Middlesex Mut. Assur. Co., No.
CV095023821, 2009 WL 2783472, at *1 (Conn. Super. Ct. Aug. 4,
2009) (finding a genuine issue of material fact as to estoppel
where insurer made comments to discourage insured from filing
suit, which led to lawsuit being filed after statute of
limitations period had expired).  Nor is there evidence in the

45

record that Great Lakes or Continental took any action
calculated or intended to induce the reliance of CPM.  Thus,
this Court rejects JDCA's estoppel claim.

### c. Reformation

Finally, JDCA asks this Court to reform the Protective
Safeguard endorsement, and therefore deny Great Lakes' request
for summary judgment.[20]  This claim, too, fails.

Under Connecticut law:

> [A] cause of action for reformation rests on the
> equitable principle that a written instrument that
> does not reflect the contracting parties' intent
> should be rewritten where the instrument is the
> product of either a mutual mistake or a unilateral
> mistake by one party coupled with actual or
> constructive fraud, or other inequitable conduct on
> the part of the other.

HSB Grp., Inc. v. SVB Underwriting, Ltd., 664 F. Supp. 2d 158,
176 (D. Conn. 2009) (Underhill, J.) (citing Lopinto v. Haines,
185 Conn. 527, 531 (1981)).  Reformation claims are to be
granted only sparingly, as "court[s] must act with the utmost
caution and can only grant the relief requested if the prayer

---

[20] The procedural history of this claim is complicated.  In
its reply brief, Great Lakes argued that JDCA was not actually
raising an estoppel defense to its summary judgment motion, but
was actually making an implicit reformation claim.  See Great
Lakes Reply 8-10.  On October 4, 2013, JDCA moved to amend its
counterclaim to make this claim explicit.  Mot. Leave Amend
Countercl., ECF No. 168.  This Court granted that motion on
October 28, 2013.  Elec. Order, Nov. 4, 2013, ECF No. 174.
Great Lakes then renewed its summary judgment claim on
reformation grounds in its supplemental memorandum.  See Great
Lakes Supplemental Mem. 3.

for reformation is supported by convincing evidence." Id. at 177.  Here, JDCA does not produce sufficient evidence to justify such relief.

Mutual mistake occurs when "through mistake, common to both parties, the written instrument fails to express the real agreement or transaction." Harlach v. Metro Prop. & Liab. Ins. Co., 221 Conn. 185, 190 (1992).  Here, however, there is no evidence that Great Lakes did not intend to issue a protective safeguards policy, and, indeed, Gerald Pratt of Continental testified that, based on his discussions with Bell & Clements, the "protective safeguard endorsement was an integral part of the policy," CPM Supplemental Mem., Ex. B, Gerald Prast Dep. 500:8-12, Jan. 7, 2014, ECF No. 181-2, and that "Great Lakes never agreed to insure this property without a protective safeguard endorsement," id. at 500:19-24.  Under such circumstances, this Court cannot conclude there was mutual mistake.

The second ground for reformation -- unilateral mistake combined with fraud or inequitable conduct -- similarly fails. Even assuming that JDCA did not believe that the contract required sprinkling, there is no evidence of fraud.  Fraud includes "not only misrepresentations known to be such, but also concealment or nondisclosure by a party who knows that the other party is acting under a mistake as to material facts." HSB

Grp., 664 F. Supp. 2d at 177 (quoting Baptist v. Bankers Indem.
Ins. Co., 245 F. Supp. 33, 37 (D. Conn. 1965) (Timbers, J.)).
There is no evidence that Great Lakes or its agent represented
that sprinklering was not required, nor is there evidence that
Great Lakes knew that JDCA was mistaken as to its belief.
Rather, the fact that JDCA represented to Great Lakes that the
Property was sprinklered, after Great Lakes asked about it
directly, implies that Great Lakes believed that the JDCA knew
about the policy.

Finally, there is insufficient evidence of inequitable
conduct in this case.  Connecticut courts have held that claims
of inequitable conduct are inappropriate for summary judgment
where the insurer has affirmatively ignored the specific
requirements of the insured and instead provided them with
coverage inconsistent with their needs and intentions.  See,
e.g., Town of Enfield v. Hamilton, 148 A. 353, 357 (Conn. 1930)
(holding that it would be inequitable conduct for an insurer
knowingly "not [to] furnish the protection the [insured] was
asking for"); Delorge v. Hartford Ins. Co. of Midwest, No.
120204, 2001 WL 688506, at *5  (Conn. Super. Ct. May 29, 2001)
(holding that inequitable conduct was a question of fact when
insurer "purposefully ignored" the insured's requests in order
to provide them with less coverage than anticipated).  Here,
there is simply no evidence that Great Lakes similarly ignored a

direct request by JDCA for nonsprinklered protection – rather, the evidence is that, at the time the contract was entered into, Great Lakes believed that it was providing coverage that required a sprinkler system to a sprinklered insured.  Under such conditions, reformation is inappropriate.

Thus, because the text of the contract states that nonsprinklered properties are not covered, and because the defenses of estoppel, waiver, and the affirmative claim of reformation are unavailable, this Court GRANTS Great Lakes' motion for summary judgment.

**C.    Flatiron Summary Judgment Motion**

**1.    Breach of Contract**

Under Connecticut law, "[t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." American Exp. Centurion Bank v. Head, 115 Conn. App. 10, 15-16 (2009) (quoting Whitaker v. Taylor, 99 Conn. App. 719, 728 (2007)); see also Restatement (Second) of Contracts § 235(2) (1981).  "Whether there was a breach of contract is ordinarily a question of fact." Town of Ridgefield v. Eppolti Realty Co., Inc., 71 Conn. App. 321, 338 (2002) (quoting Paulus v. Lasala, 56 Conn. App. 139, 153 (1999)).  That said, if the "facts are undisputed . . . the question becomes one appropriate for

summary judgment." BLD Prod., LLC v. Remote Prod. Inc., 509 F.
App'x 81, 81 (2d Cir. 2013).

In its complaint, JDCA alleges that Flatiron breached its
agreement with JDCA by "fail[ing] to pay when due" the Great
Lakes premium. Rev. Third-Party Compl. 3. This claim, however,
is not supported by the evidence. Flatiron entered into a
Premium Finance Agreement ("PFA") with JDCA, which was executed
(and thus formed) on November 1, 2010. Under the contract,
Flatiron was obligated, upon written acceptance of the contract,
to pay Continental the premiums necessary to fund the Great
Lakes policy. By all accounts provided in the record, Flatiron
paid the policy, as the contract required, by placing a check in
the mail on November 1.

Indeed, neither CPM nor JDCA can point to any "specific
facts" that would support a finding of breach.[21] Gottlieb, 84
F.3d at 519. Rather, in its only reference to the breach of
contract claim, CPM states only that it is disputed "[w]hether

_____

[21] Moreover, both parties also make statements acknowledging
that the payments appear to have been made in accordance with
the contractual terms. See JDCA Flatiron Opp'n 1 ("The position
of [JDCA] . . . is simply that it agrees with [Flatiron] that
payment of the premium was timely made on November 1, 2010 prior
to cancellation on November 2, 2010."); CPM Opp'n Flatiron 2
("CPM does not believe that payment to [Great Lakes] was
untimely so as to effect cancellation of the subject policy.
However, to the extent that the Court concludes that there
remain issues of fact related to timely payment of the premium,
or that Great Lakes' disclaimer of coverage as to the
cancellation of its policy is valid, it is improper to grant
summary judgment to Flatiron.").

Flatiron failed to comply with the express or implied terms of
the contract between it and JDCA by failing to take steps to
forward the financed premium funds such that they were actually
received by [Continental] prior to the date of the alleged
cancellation," Local Rule 56(a)(2) Statement & Disputed Issues
Material Fact, ECF No. 155-4, a statement JDCA endorses in its
own opposition to summary judgment, Mem. Law. Def. JDCA, LLC
Partial Opp'n Third-Party Defs. Wells Fargo Bank, Mot. Summ. J.
("JDCA Flatiron Opp'n") 2, ECF No. 157.

JDCA does not point to any evidence that would support such
a dispute, or highlight any contractual language in the PFA
which would support an inference that Flatiron was obligated to
deliver the funds by any specific date, much less by November 1,
2010.[22]  Indeed, the PFA is silent as to date of performance.
Moreover, under Connecticut law, "[w]here no time for
performance of a contract is contained within its terms, the law
presumes that it is to be performed within a reasonable time."
Colby v. Burnham, 31 Conn. App. 707, 715 (1993).  Here, Flatiron
performed its payment obligations the same day the contract was
executed.  While the determination of what is a reasonable time
is generally a question of fact, under certain circumstances,

---

[22] CPM and JDCA's filings are also not in compliance with
Local Rule of Civil Procedure 56(a)(3), which requires
assertions made in Local Rule 56 statements to include specific
references to admissible evidence in the record.

when the facts are not in dispute or where evidence of an essential element of the claim is unavailable, "the court may decide the issue as a matter of law." Brzezinek v. Covenant Ins. Co., No. CV000505956S, 2001 WL 1132210, at *4 (Conn. Super. Ct. Aug. 7, 2011).

Here, JDCA and CPM proffer no evidence that same-day compliance was unreasonable, and thus this Court concludes as matter of law, based on the fact that there is no evidence that Flatiron's performance was unreasonable or not in accordance with the contract, that Flatiron did not breach the contract. Given the lack of any factual assertions by JDCA supporting an allegation of breach of contract, the Court GRANTS Flatiron's motion for summary judgment on the alleged breach of contract.

## 2. Negligence

JDCA's second claim against Flatiron sounds in negligence: that Flatiron knew or should have known that the Great Lakes policy was to be canceled on November 2, 2010, and either: (1) should have taken steps to advance payment, so that it would have reached Continental before November 2, 2010, or (2) should have notified JDCA that the payment would not reach Continental until after the policy had been cancelled. See Rev. Third-Party Compl. 5-6.

The four essential elements of a negligence claim are "duty, breach of that duty, causation, and actual injury," with

duty encompassing both an inquiry "to determine the existence of a duty," and then a separate determination of the "requisite standard of care." Baptise v. Better Val-U Supermarket, Inc., 262 Conn. 135, 138 (2002). In this case, the litigants focus on the question of duty.

"A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act," the latter of which is termed common-law duty. Pelletier v. Sordoni/Skanska Constr. Co., 286 Conn. 563, 578 (2008) (quoting Ward v. Greene, 267 Conn. 539, 547 (2004)). The issue of whether a duty exists is a question of law; a determination of whether that duty has been breached is a question for the fact finder. Shore v. Town of Stonington, 187 Conn. 147, 151-52 (1982). Here, litigants do not point to a contractual or statutory basis for duty, so this Court must consider whether there is a common law basis for liability.

In Zamstein, the Connecticut Supreme Court formulated a two-part test to find duty. The court must make:

> (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend

to the particular consequences or particular plaintiff
in the case.

Zamstein v. Marvasti, 240 Conn. 549, 558 (1997) (internal

quotation marks omitted).  The first factor thus requires a

foreseeability analysis, the second requires consideration of

whether the injury is "too tenuous to impose liability for . . .

collateral consequences."[23]  RK Constructors, Inc. v. Fuesco

Corp., 231 Conn. 381, 388 (1994).  Moreover, the public policy

implications are determined by considering "(1) the normal

expectations of the participants in the activity under review;

(2) the public policy of encouraging participation in the

activity, while weighing the safety of the participants; (3) the

avoidance of increased litigation; and (4) the decisions of

other jurisdictions."  Monk v. Temple George Assoc., LLC, 273

Conn. 109, 118 (2005); see also Ruiz v. Victory Props., LLC, 135

Conn. App. 119, 128-31 (2012) (applying Monk factors).

   "The plaintiff has the burden of proving by a fair

preponderance of the evidence that the defendant was in fact

negligent."  Hackling v. Casbro Constr. of R.I., 67 Conn. App.

286, 294 n.4 (2001); see also Gulycz v. Stop & Shop Cos., Inc.,

29 Conn. App. 519, 523 (1992) (same).  In order to defeat a

motion for summary judgment on a negligence count, the

---

[23] In this respect, the duty and the proximate cause analyses
overlap.  See Pisel v. Stamford Hosp., 180 Conn. 314, 333
(1980).

nonmovant-plaintiff must "set forth . . . specific facts to contradict" evidence introduced by the movant-defendant; "unsupported allegations" are insufficient.  <u>Nutt</u> v. <u>Norwich Roman Catholic Diocese</u>, 56 F. Supp. 2d 195, 201 (D. Conn. 1999) (Covello, J.).

In its complaint, JDCA alleges that because Flatiron knew that the Great Lakes policy would be cancelled on November 2, 2010 if payment was not received before that date, the purported cancellation of the Great Lakes policy could be imputed to the negligence of Flatiron.  Third Party Compl. 5.[24]  Based on the evidence currently available, however, this Court grants summary judgment to Flatiron.

First, there is insufficient factual support for a reasonable jury to find the key predicate underlying JDCA's negligence claim: that Flatiron knew (or should have known) that

---

[24] JDCA alleges that Flatiron committed five distinct acts of negligence: (1) that it knew that the "policy was to be cancelled on November 2, 2010, at 12:01 a.m." and did not make payment until November 2; (2) that it knew that JDCA was "relying on the fact that it had property and casualty insurance yet it failed to notify [JDCA] it was not going to forward the premium payments prior to the cancellation time"; (3) that it did not advise JDCA to make payments directly to Continental or Great Lakes; (4) that it did not warn JDCA that "it should make payments to Flat Iron prior to November 1, 2010 to avoid cancellation"; and (5) that it failed to advise JDCA that "it did not make an appropriate advanced premium payment agreement to [Continental and/or Great Lakes and/or CPM] to properly secure and maintain the subject property and casualty insurance."  Third Party Compl. 5-6.

Great Lakes would cancel the policy if payment was not received by 12:01 a.m. on November 2, 2010.  If this predicate is not true, Flatiron would not owe JDCA a duty.

JDCA offers two pieces of evidence: (1) that Rivera, its representative, told Flatiron's representative that she "got a cancellation notice telling me this was [going] to be cancelled," Rivera Call 3, which presumably referred to the Continental cancellation notice, and (2) that Rivera was told that "all [she] had to do was pay the September premium . . . and everything would be fine," Rivera Dep. 34:4-6.  It then argues that this indicates that Flatiron knew that the Great Lakes contract (the insurance binder) would be cancelled if payment was not received immediately.  Both of these discussions, however, emerged in the context of paying the obligation owed under the <u>Flatiron</u> contract, not the <u>Great Lakes</u> contract, and there is no indication that the Flatiron representatives knew that Rivera was referring to the Great Lakes bill.  Rather, it appears that he believed that the call was in reference to the Flatiron contract.[25]

_____

[25] For example, in response to a Rivera's comment "And I guess this is due today," the Flatiron representative responded "Yeah, the first one was due on the, on the 13th."  Rivera Call 3.  The Flatiron payment was due on the 13th of the month, the Great Lakes payment was due by the 2nd.  Thus, while JDCA may have been referring to the latter payment, Flatiron's references are to the former payment obligation.  Moreover, when Flatiron's representative told Rivera that "all we had to do was pay the

Even assuming that from these facts a jury could reasonably find that Flatiron should have known that Rivera was referring to the Great Lakes contract, not the PFA, there is insufficient evidence to support an inference that Flatiron knew the Great Lakes contract would be cancelled if payment was not received that day, November 1. In the conversation between Rivera and Flatiron, only two pieces of information were disclosed: (1) that Rivera had received a cancellation notice, and (2) that Rivera had guessed that the bill "is due today." Rivera Call 3. Given that many commercial contracts allow for a gap between when a bill is due and when consequences arise, that Rivera never explicitly stated when the contract would be cancelled, and that the context of the conversation was regarding the PFA between Flatiron and JDCA, not the Great Lakes agreement with JDCA, it does not seem that a reasonable jury could conclude Flatiron knew that the Great Lakes agreement would have been cancelled if the payment to Flatiron was not received on that day. See Donovan v. Centerpulse Spine Tech Inc., 416 F. App'x 104, 106 (2d Cir. 2011) ("[T]aking one statement from [the record] out of context, without more, provides insufficient

_____

September premium for the 673.34 and everything would be fine," Rivera Dep. 34:5-6, that amount referred to the payments owed Flatiron under the PFA, not the several thousand dollars worth of payments owed to Great Lakes. Given this context, it appears clear that Flatiron's representatives were referring to the PFA contract, not the Great Lakes contract.

explanation."); Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) ("[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.") (quoting Anderson, 477 U.S. at 252).

Thus, if Flatiron did not know when the Great Lakes contract would be cancelled, the consequences of such a cancelation would not be foreseeable, and it would not owe JDCA a duty under Zamstein's first prong.  Even if it did know that the Great Lakes contract was about to be cancelled, however, Zamstein's second prong, whether a public policy analysis would reveal that that the collateral consequences are too tenuous to impose liability, is problematic for JDCA.

Monk establishes a four-element test to determine whether public policy supports the existence or creation of a duty.  273 Conn. at 118.  First, the court must consider the normal expectations of the participants.  Here, the interaction between JDCA and Flatiron is in the context of a commercial contract, where good faith and arms-length negotiations are presumed (and of which there is no evidence to the contrary here).  Under those situations, parties have a "general right to act on [their] own interests," M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990), subject to the constraints imposed by the contract itself, and courts are hesitant to impose additional implied affirmative obligations in the contractual

context.  Cf. Perricone v. Perricone, 292 Conn. 187, 203 n.15
(2009).  That is especially true where, as here, Flatiron
complied with the contract.  Second, the court should look to
the "public policy of encouraging participation in the activity,
while weighing the safety of the participants."  Monk, 273 Conn.
at 118.  This factor applies more naturally in the context of
product liability suit, rather than to negligence actions
between parties to a contract.  Generalizing slightly, however,
this factor implies a cost-benefit analysis as to the efficacy
of imposing a duty.  Here, imposing a duty would likely result
in insurance premium financers inquiring more frequently into
the nature and conditions of the underlying insurance contracts.
Such inquiries would take time (and thus cost money), although
they might prevent incidents such as this one from occurring.
This factor is thus equivocal with regards to finding duty.  The
third factor, avoiding increased litigation, cuts against
declaring a duty (as it almost invariably must).  Finally,
looking to the fourth factor, the decisions of other
jurisdictions, there are no obvious examples of courts imposing
liability under these circumstances, and indeed, the parties
have not pointed to any case law suggesting as much.  See
Flatiron Summ. J. Mem. 11.  This test thus points in favor of a
holding that Flatiron owed no duty beyond its contractual
obligations.

Finally, even assuming there was both knowledge of the contract and a duty, there is no evidence that the standard of care itself has been breached.  As discussed above, by all indications, Flatiron appears to have paid the premium the date the contract took effect.  There is no evidence in the record suggesting that such behavior violated a duty to pay promptly, and without such evidence, this Court cannot find evidence to support an element of breach.  While the question of breach is one of fact, not law, at the summary judgment stage, the nonmoving party must "make a sufficient showing on . . . [every] essential element of her case with respect to which she has the burden of proof."  Celotex, 477 U.S. at 323.  Here, breach is such an essential element.

Thus, this Court GRANTS summary judgment to Flatiron on the negligence count.

### 3.   Procedural Objections

CPM and JDCA make two additional objections, both procedural, to Flatiron's summary judgment motion.  Neither has merit.

First, the objecting parties argue that it is inappropriate to grant judgment on one claim without resolving the entire dispute.  See CPM Opp'n Flatiron 6 ("Thus, for Flatiron to claim that it is somehow entitled to summary judgment without regard to the other litigants as to this issue is premature and a waste

of time.").  Such an argument misconceives the nature of summary judgment.  As per Federal Rule of Civil Procedure 56, a summary judgment motion need not address <u>all</u> of the claims in a lawsuit, but explicitly may identify only "part of each claim or defense" upon which judgment is sought.[26]  Fed. R. Civ. P. 56(a).  Thus, if on one issue or party "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the court must grant summary judgment, even if the judgment does not resolve the entire dispute.

CPM further argues that summary judgment would be inappropriate because "CPM may be entitled to indemnification or contribution from Flatiron."  CPM Opp'n Flatiron 7.  Unless specifically designated, however, any decision that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties," as summary judgment in this context would, "does not end the action as to any of the claims or parties and may be revised at any time before the entry of a

---

[26] Other parts of the Federal Rules of Civil Procedure also recognize that some, but not all, claims in an action may be adjudicated by motion.  <u>See</u> Fed. R. Civ. P. 54(b) ("When an action presents more than one claim for relief . . . or where multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be resolved at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

judgment adjudicating all the claims and all the parties' rights
and liabilities." Fed. R. Civ. P. 54(b). Thus, even assuming
that keeping all parties together on the basis of future
indemnification claims is a valid reason for denying summary
judgment, a summary judgment motion would not preclude future
indemnification actions in the context of this lawsuit, since
Flatiron would still be part of the action until all claims have
been adjudicated.

### D.    JDCA Interlocutory Summary Judgment Motion

On August 7, 2013, JDCA filed a motion for interlocutory
summary judgment "on the issue as to whether or not [JDCA] made
a timely payment on November 1, 2010, to avoid cancellation on
November 2, 2010." JDCA Summ. J. Mot. 2. JDCA did not include
a Local Rule 56(a)(1) statement or a memorandum with citations
to the record, but rather stated that the motion was supported
"[f]or the reasons set forth by [Flatiron], in support of [its
summary judgment motion] and for the reasons set forth by both
[CPM] and [JDCA] in response." Id. Great Lakes opposed,
primarily arguing that (1) the motion was not in compliance with
Federal Rule of Civil Procedure 56, or with the local rules, and
(2) there was a question of fact as to whether the premium had
been accepted. Great Lakes JDCA Opp'n 3-6.

This court denies JDCA's motion for interlocutory summary
judgment. First, as Great Lakes recognized, the motion neither

conforms to the requirements of Federal Rule of Civil Procedure 56, in that it does not support its assertions by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), nor does it satisfy Local Rule 56(a), which requires a Local Rule 56(a)(1) Statement that is followed by specific citations to materials in the record, L.R. 56(a)(1), (3).  Instead, it rests its argument on Flatiron's summary judgment motion and accompanying memorandum, CPM's response thereto, and, through internal cross-references, its own opposition to Great Lakes' summary judgment motion.[27]

Under controlling Second Circuit precedent, a district court has "broad discretion" to excuse a party's noncompliance with local court rules, Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001), so as "to best achieve a just outcome." Wright v. BankAmerica Corp., 219 F.3d 79, 86 (2d Cir. 2000)

---

[27] JDCA indicated in its motion that it was also relying on its own objection to Flatiron's motion for summary judgment to serve as its motion for summary judgment.  JDCA Summ J. Mot. 2. Because that opposition adopted in full the reasoning expressed in CPM's opposition memorandum, this Court collapses the distinction between the two documents, and refers only to CPM's memorandum.  That said, JDCA's opposition to Flatiron's summary judgment motion also adopts the arguments set out in JDCA's opposition to Great Lake's summary judgment motion, JDCA Opp'n Flatiron 2, and that document does argue that JDCA's payments were made in time, JDCA Second Opp'n Mem. 4-6.  Thus, by following JDCA's motion for summary judgment, which refers to JDCA's opposition to Flatiron's summary judgment, which refers in turn to JDCA's opposition to Great Lakes' summary judgment, it is possible to find an affirmative argument that JDCA made timely payments to Great Lakes.

(quoting Somlyo v. J. Lu-Rob Enter., 923 F.2d 1043, 1049 (1991)). In this context, however, exercising such discretion is not warranted. First, CPM's memorandum generally focuses on Flatiron's actions under its contract (the PFA), not under the Great Lakes contract and/or the Great Lakes Notice of Cancellation. Such references are thus of limited help here. Second, the references in CPM's memorandum contradict JDCA's motion. CPM argues that there is a potential question of fact as to whether Flatiron properly processed the finance premium funds, a conclusion that is flatly inconsistent with JDCA's motion stating that there is no dispute as to the fact that the payment from JDCA to Flatiron, and then from Flatiron to Continental, was timely. See CPM Opp'n Flatiron 2 ("It could reasonably be argued that Flatiron failed to take the necessary reasonable steps to forward the financed premium funds such that they were actually received by [Continental] prior to the date of the alleged cancelation."). Justice would not be served by allowing a motion based on contradictory, cross-referenced arguments.

Third, local rules are designed to "make both the parties' and the court's tasks easier," by promoting "clarity of presentation and ease of understanding and referencing." Ogborn v. United Food & Comm. Workers, Local No. 881, No. 98 C 4723, 2000 WL 1409855, at *3 n.4 (N.D. Ill. 2000). A summary judgment

motion which requires parties to trace through several iterations of cross-referenced <u>oppositions</u> to summary judgment, some of which refer to a different contractual obligation than the one at issue at the instant motion, to determine an argument <u>in favor</u> of summary judgment, does not promote that ease of understanding.  This Court will not exercise its discretion in such a context.

Fourth, even if the pleadings are adequate, there are at least some disputed issues of material fact that make summary judgment inappropriate.  The core issue here, as identified by the parties, is whether JDCA's payment is considered timely if it was mailed to Continental before it was due, as it was, or whether it must have been received by Continental before the due date, as it was not.  <u>See</u> Great Lakes Supplemental Opp'n 2.  The timeliness question is governed by Connecticut's version of the mailbox rule, which states that:

> If a person to whom money is due, either by express
> assent or by a course of dealing from which assent may
> be inferred, authorizes its transmission by mail, the
> person for whom it was due is relieved from the
> consequences of a default if it is duly and properly
> put into mail.

<u>Kerin</u> v. <u>Udolf</u>, 165 Conn. 264, 268 (1973).  Here, JDCA offers no affirmative evidence in its motion that Continental consented to consider payments timely when mailed.  <u>See</u> <u>id.</u>; Great Lakes JDCA Opp'n 5.  Moreover, in a deposition held with Paula Zukowski,

Continental's bookkeeper, she indicated that she did not recall any instructions stating that a check was to be considered received upon mailing.  See Great Lakes Supplemental Opp'n, Ex. A, Dep. Paula Zukowski 99:15-19; 102:9-14, Jan. 10, 2014, ECF No. 177-1. Denise Borrelli, Continental's president, further confirmed that it was the company's policy not to accept payment until the check had been received.  See Great Lakes Supplemental Opp'n, Ex. B, Dep. Denise Borrelli, 39:5-25; 90:7-11, ECF No. 177-2.  Such evidence, especially in light of the summary judgment standard requiring this Court to draw all inferences against the moving party, suggests that Continental did not have a policy of accepting checks upon mailing, or, at the very least, that the existence of such a policy is a contested material fact.  For these reasons, this Court DENIES JDCA's motion for summary judgment.

## III. CONCLUSION

For the aforementioned reasons, this Court: (1) GRANTS Great Lake's motion for summary judgment, ECF No. 98; (2) GRANTS Flatiron's motion for summary judgment, ECF No. 151; and (3) DENIES JDCA's motion for interlocutory summary judgment, ECF No. 156.

**SO ORDERED.**


_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE